**No. 25-11722**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

Southern Cross Seafoods, LLC,

*Plaintiff-Appellant*,

v.

United States of America and National Marine Fisheries Service,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Florida

No. 24-60040-LEIBOWITZ

---

# BRIEF OF *AMICUS CURIAE* CENTER FOR BIOLOGICAL DIVERSITY IN SUPPORT OF APPELLEES UNITED STATES OF AMERICA AND NATIONAL MARINE FISHERIES SERVICE

---

Andrew B. Loewenstein
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617-832-1000
aloewenstein@foleyhoag.com

Nicholas M. Renzler
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: 212-812-0400
nrenzler@foleyhoag.com

*Attorneys for the Center for Biological Diversity*

## CERTIFICATE OF INTERESTED PERSONS

As required by Eleventh Circuit Rule 26.1-1, I certify that in addition to the persons set forth in Appellant's brief, the following persons have an interest in the outcome of this matter:

1. Center for Biological Diversity (*amicus curiae*)
2. Andrew B. Loewenstein and Nicholas M. Renzler (counsel for *amicus curiae*)

March 20, 2026

/s/ *Nicholas M. Renzler*
Nicholas M. Renzler

# CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* is a 501(c)(3) nonprofit corporation. It has no parent corporation and does not issue stock.

March 20, 2026

/s/ *Nicholas M. Renzler*
Nicholas M. Renzler

## STATEMENT OF INDEPENDENCE OF *AMICUS CURIAE*

No party's counsel authored this brief, in whole or in part. No party and no party's counsel contributed money intended to fund preparing or submitting this brief. Further, no person—other than the *amicus curiae*, its members, or its counsel—contributed money intended to fund preparing or submitting this brief.

# TABLE OF CONTENTS


INTRODUCTION, SUMMARY OF ARGUMENT, AND STATEMENT OF INTEREST OF *AMICUS CURIAE* ........ 1

ARGUMENT ........ 4

I. Interpreting CM 31-01 to Prohibit Fishing in Subarea 48.3 in the Absence of a CCAMLR-Adopted Catch Limit Gives Effect to the Objectives of the CAMLR Convention and CM 31-01. ........ 7

A. The CAMLR Convention ........ 7

B. CM 31-01 ........ 12

II. The Express Views and Practice of the Convention Parties Confirm that Fishing is Not Permitted in Subarea 48.3 When CCAMLR Has Not Adopted a Catch Limit. ........ 16

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bufkin v. Collins*,
604 U.S. 369 (2025)....................10

*In re Comm'r's Subpoenas*,
325 F.3d 1287 (11th Cir. 2003)....................6

*Cornejo v. Cty. of San Diego*,
504 F.3d 853 (9th Cir. 2007)....................5

*Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*,
34 F.4th 1290 (11th Cir. 2022)....................5

*Cortes v. Am. Airlines, Inc.*,
177 F.3d 1272 (11th Cir. 1999)....................6

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016)....................10

*Medellin v. Texas*,
552 U.S. 491 (2008)....................6, 10, 17, 21

*Southern Cross Seafoods, LLC v. United States*,
No. 0:24-cv-60040-LEIBOWITZ, slip op.
(S.D. Fla. Mar. 29, 2025)....................2, 3, 7, 11

*Sumitomo Shoji Am. v. Avagliano*,
457 U.S. 176 (1982)....................6

*Swarna v. Al-Awadi*,
622 F.3d 123 (2d Cir. 2010)....................6, 17

*United States v. Stuart*,
489 U.S. 353 (1989)....................22

*Water Splash, Inc. v. Menon*,
581 U.S. 271 (2017)....................6, 17, 21

**International Cases**

*Application for Review of Judgement No. 158 of the United Nations Administrative Tribunal*, Advisory Opinion, 1973 I.C.J. Rep. 166 (July 12) ....................10

**Treaties**

1964 Agreed Measures for the Conservation of Antarctic Fauna and Flora, *Recommendations adopted at the Third Consultative Meeting, done at Brussels June 2-13, 1964*, https://tinyurl.com/1964Measures ....................8

Antarctic Treaty, Dec. 1, 1959, 402 U.N.T.S. 71, ....................7

Convention for the Conservation of Antarctic Seals, June 1, 1972, 1080 U.N.T.S. 175....................8

Convention on the Conservation of Antarctic Marine Living Resources, May 7, 1980, 1329 U.N.T.S. 47 ....................1, 7, 10, 11, 12

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331....................5, 6, 22

**International Regulations**

Antarctic Treaty Consultative Meeting Recommendation VIII-10 (1975), https://tinyurl.com/VIII-10....................8

Antarctic Treaty Consultative Meeting Recommendation IX-2 (1977), https://tinyurl.com/ATCM-IX-2 ....................8

Commission Secretariat, Conservation Measure 31-01 (1986), https://tinyurl.com/CM-3101-1986....................2, 13

Commission Secretariat, Conservation Measure 8/VI (1987), https://tinyurl.com/yehtw3dp....................13

Commission Secretariat, Conservation Measure 10/VI (1987), https://tinyurl.com/2j6u4dpf....................14

Commission Secretariat, Conservation Measure 24/IX (1990), https://tinyurl.com/yc8neud6 ....................14

**Other Authorities**

Commission Secretariat, *Report of the Third Meeting of the Commission* (1984), https://tinyurl.com/CCAMLR-III....................................13

Commission Secretariat, *Report of the Third Meeting of the Scientific Committee* (1984), https://tinyurl.com/SC-CAMLR-III....................................13

Commission Secretariat, *Report of the Fourth Meeting of the Scientific Committee* (1985), https://tinyurl.com/SC-CAMLR-IV ....................13

Commission Secretariat, *Report of the Fifth Meeting of the Commission* (1986), https://tinyurl.com/CCAMLR-V......................................13

Commission Secretariat, *Report of the Eighth Meeting of the Commission* (1989), https://tinyurl.com/4w8bnz57 ..........................................14

Commission Secretariat, *Report of the Eighth Meeting of the Scientific Committee* (1989), https://tinyurl.com/SC-CAMLR-VIII.................................14

Commission Secretariat, *Report of the Ninth Meeting of the Commission* (1990), https://tinyurl.com/CCAMLR-IX; ...................................14

Commission Secretariat, *Report of the Fortieth Meeting of the Commission* (2021), https://tinyurl.com/38z76fzn ................................14, 18, 19

Commission Secretariat, *Report of the Forty-First Meeting of the Commission* (2022), https://tinyurl.com/msjsbh8u..........................18, 19, 20, 21

Commission Secretariat, *Report of the Forty-Second Meeting of the Commission* (2023), https://tinyurl.com/yjnazshd.......................................18, 20

Commission Secretariat, *Report of the Forty-Fourth Meeting of the Commission* (2025), https://tinyurl.com/3kr2mh4h.....................................19, 20

*Final Act of the Conference on the Conservation of Antarctic Marine Living Resources* (1980), https://tinyurl.com/CAMLRFinalAct.......................8, 9

Silja Vöneky & Sange Addison-Agyei, *Antarctica*, MAX PLANCK ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW (2019), https://tinyurl.com/MPEPIL-Antarctica ..............................................................7

## INTRODUCTION, SUMMARY OF ARGUMENT, AND STATEMENT OF INTEREST OF *AMICUS CURIAE*

*Amicus curiae*, the Center for Biological Diversity ("the Center"), is a United States-based, nongovernmental organization that advocates for the protection of endangered, threatened, and rare species and their habitats. Through its Oceans and International programs, the Center works to protect marine mammals, seabirds, fish, and other marine creatures that are threatened by, *inter alia*, unsustainable or harmful fishing practices.

The Center has a strong interest in the proper interpretation and application of international agreements concerning environmental conservation. The Center is deeply involved in promoting conservation in the Antarctic region, including in the waters of Antarctica. The Center therefore has a particularly strong interest in the proper interpretation and application of the Convention on the Conservation of Antarctic Marine Living Resources, May 7, 1980, 1329 U.N.T.S. 47 (the "CAMLR Convention" or the "Convention"), and of the conservation measures adopted by the Commission for the Conservation of Antarctic Marine Living Resources ("CCAMLR" or the "Commission"), the international regulatory body established under the Convention that adopts binding measures which govern fishing in the Southern Ocean.

In this action, Appellant appeals from the decision of the U.S. District Court for the Southern District of Florida holding that "[t]he United States acted in

accordance with law when it denied [Appellant's] application for a preapproval certificate to import [Patagonian] toothfish harvested in Subarea 48.3 in the 2021/2022 fishing season" and granting summary judgment in Appellees' favor on that basis. *Southern Cross Seafoods, LLC v. United States*, No. 0:24-cv-60040-LEIBOWITZ, slip op. at 37 (S.D. Fla. Mar. 29, 2025).

The District Court's decision, and the underlying denial of Appellant's application, were correct. The fish that Appellant sought to import were harvested in an area of the Southern Ocean—known as Subarea 48.3—in contravention of a binding conservation measure, known as Conservation Measure 31-01 ("CM 31-01"), that had been duly adopted by CCAMLR. D.E. 6 ¶ 1.

CM 31-01 provides:

> Without prejudice to other conservation measures adopted by the Commission, for species upon which fisheries are permitted around South Georgia (Statistical Subarea 48.3), the Commission shall, at its 1987 Meeting, adopt limitations on catch, or equivalent Measures, binding for the 1987/88 season.
>
> Such limitations of catch or equivalent measures shall be based upon the advice of the Scientific Committee, taking into account any data resulting from fishery surveys around South Georgia.
>
> For each fishing season after 1987/88, the Commission shall establish such limitations or other measures, as necessary, around South Georgia on a similar basis at the meeting of the Commission immediately preceding that season.

CM 31-01, https://tinyurl.com/CM-3101-1986.

CCAMLR did not adopt a catch limit or equivalent measure for Patagonian toothfish in Subarea 48.3 for the 2021/22 fishing season. The effect was to close the subarea to fishing. As the United States explained when denying the importation certificate: "In the absence of any measure affirmatively establishing a catch limit and other fishery-specific requirements for th[at] season, fishing in Subarea 48.3 was not authorized under CCAMLR conservation measures." D.E. 6 at 22. The District Court agreed with this interpretation. It held: "[W]hen [the Commission] fails to adopt a specific catch limit of toothfish in Subarea 48.3, all toothfish fishing is prohibited in Subarea 48.3 under CCAMLR and CM 31-01." *Southern Cross*, slip op. at 36.

In challenging that decision, Appellant contends that the absence of a CCAMLR-adopted catch limit opened Subarea 48.3 to unlimited fishing. App. Br. at 50. This turns the CAMLR Convention's conservation regime on its head. As detailed below, the Contracting Parties to the Convention adopted that treaty for the specific purpose of promoting marine conservation. This entails preventing overfishing of the Southern Ocean's vulnerable fish stocks by means of scientifically-informed catch limits or equivalent measures that CCAMLR adopts by consensus. That overarching objective is given effect in Subarea 48.3 through CM 31-01. Appellant's wrongheaded view that CM 31-01 somehow authorizes unlimited fishing when CCAMLR does not adopt a catch limit is antithetical to the

text and objectives of the CAMLR Convention generally and CM 31-01 in particular.

If accepted, Appellant's interpretation would do serious damage to the Convention's carefully drawn environmental protection regime. For that reason, many of the Convention's Contracting Parties have gone on record as agreeing with the United States that the absence of a catch limit for Subarea 48.3 means that it is closed to fishing. These include the European Union (which represents 11 State Parties to the Convention), the Russian Federation, the People's Republic of China, the Argentine Republic, and the Oriental Republic of Uruguay. As parties to the CAMLR Convention, the Court must give their views considerable weight. Since those views correspond to the United States' own interpretation, the weight to which they are entitled is significant. And, as this interpretation reflects the text, context, and object and purpose of the Convention and CM 31-01, the views of the United States and its treaty-partners are dispositive.

The Court should therefore affirm the District Court's judgment.

## ARGUMENT

The District Court's interpretation of CM 31-01 properly applied the principles governing treaty interpretation. Appellant agrees that these principles apply to the interpretation of CM 31-01. App. Br. at 26. However, Appellant grossly misapplies them in arguing that CM 31-01 should not be interpreted as "a prohibition

on harvesting toothfish in the absence of a catch limit." *Id.* at 27. The result of Appellant's misinterpretation of CM 31-01 would be that, when CCAMLR does not adopt a catch limit thereunder, Subarea 48.3 is open to unlimited fishing. The Court should reject this interpretation, which cannot be squared with the interpretive principles that govern its consideration of the CAMLR conservation measure.

Appellant's argument rests on a fundamental misapprehension. According to Appellant, in treaty interpretation, just like when "interpret[ing] … a statute," the "text is the starting point—and often the end point." *Id.* at 26. And, Appellant further argues, because CM 31-01's "text … does not prohibit fishing in Subarea 48.3 in the absence of a catch limit," it cannot be interpreted as prohibiting fishing where no catch limit has been adopted. *Id.*

Appellant is wrong. Its argument runs headlong into the fact that "[t]reaties are different from statutes, and come with their own rules of the road," *Cornejo v. Cty. of San Diego*, 504 F.3d 853, 858 n.9 (9th Cir. 2007). As this Court has held, the Vienna Convention on the Law of Treaties ("VCLT"), May 23, 1969, 1155 U.N.T.S. 331, is the "authoritative guide for [treaty] interpretation," *Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 34 F.4th 1290, 1306 n.5 (11th Cir. 2022). Contrary to Appellant's attempt to suggest otherwise, the VCLT does not treat a treaty's text as the "end point." Instead, it requires interpreting a treaty "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty

in their context and in the light of its object and purpose," VCLT, art. 31(1). This mandates looking beyond the text of the treaty, including to its context and object and purpose. Moreover, while not conclusive, "great weight" must be given to the United States's own interpretation, *Medellin v. Texas*, 552 U.S. 491, 513 (2008); *see also Sumitomo Shoji Am. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight"); *Swarna v. Al-Awadi,* 622 F.3d 123, 136 (2d Cir. 2010) (endorsing the "'well established canon of deference' with regard to Executive Branch interpretation of treaties") (internal quotation marks omitted); *In re Comm'r's Subpoenas*, 325 F.3d 1287, 1304 (11th Cir. 2003) ("'Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty.'") (quoting *El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999)); *Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1289 (11th Cir. 1999) (same). Further, "considerable weight" must be accorded to the views of the other treaty parties. *Water Splash, Inc. v. Menon*, 581 U.S. 271, 282 (2017) (citing *Abbott v. Abbott,* 560 U.S. 1, 16 (2010)).

Properly applying these principles requires rejecting Appellant's interpretation of CM 31-01, which is antithetical to the context and object and purpose of both CAMLR and CM 31-01, as well as to the clearly articulated views

of the United States and many other parties to the treaty. The Court should therefore affirm the District Court's judgment.

## I. Interpreting CM 31-01 to Prohibit Fishing in Subarea 48.3 in the Absence of a CCAMLR-Adopted Catch Limit Gives Effect to the Objectives of the CAMLR Convention and CM 31-01.

### A. The CAMLR Convention

As the District Court correctly recognized, the CAMLR Convention is an environmental conservation treaty. *See Southern Cross*, slip op. at 36. Fundamentally, its objective is to conserve Antarctica's vulnerable marine resources. *See* CAMLR Convention, art. II(1) ("The objective of this Convention is the conservation of Antarctic marine living resources."). The CAMLR Convention is an integral part of the Antarctic Treaty System, which is a set of international "agreements made … to co-ordinate activities and relations on the Antarctic continent." Silja Vöneky & Sange Addison-Agyei, *Antarctica*, MAX PLANCK ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW (2019), ¶ 12, https://tinyurl.com/MPEPIL-Antarctica. That system is based on specific objectives, including "the protection of the Antarctic environment." *Id.*, ¶ 13. Environmental conservation thus lies at the core of the system. Its foundational treaty, the Antarctic Treaty, requires its parties to adopt, *inter alia*, "measures regarding … the preservation and conservation of living resources in Antarctica." Antarctic Treaty, Dec. 1, 1959, 402 U.N.T.S. 71, art. IX(1)(f).

Acting on this obligation, in 1975, the 12 original parties to the Antarctic Treaty recommended the adoption of "effective measures for the conservation of Antarctic marine living resources." Antarctic Treaty Consultative Meeting ("ATCM") Recommendation VIII-10 (1975), ¶ 3, https://tinyurl.com/VIII-10. Those measures were urgently required. In 1977, the parties agreed that a "definitive regime for the Conservation of Antarctic Marine Living Resources should be concluded before the end of 1978." ATCM Recommendation IX-2 (1977), ¶ III(1), https://tinyurl.com/ATCM-IX-2.[1] And they resolved that this "regime should explicitly recognize" their "prime responsibilities" in regard to "the protection and conservation of the environment in the Antarctic Treaty area." *Id.*, ¶ III(3)(a).

The parties adopted the final text of the CAMLR Convention at the May 1980 Conference on the Conservation of Antarctic Marine Living Resources. The Conference's Final Act described the Convention as "a definitive regime for the conservation of Antarctic marine living resources." *Final Act of the Conference on the Conservation of Antarctic Marine Living Resources* (1980), § II, https://tinyurl.com/CAMLRFinalAct. It urged the Convention's signatories to "take

[1] The parties had earlier adopted measures for the protection of other aspects of Antarctic wildlife. *See* Agreed Measures for the Conservation of Antarctic Fauna and Flora, *Recommendations adopted at the Third Consultative Meeting, done at Brussels June 2-13, 1964*, https://tinyurl.com/1964Measures (protecting native mammals and birds on the Antarctic continent); Convention for the Conservation of Antarctic Seals, June 1, 1972, 1080 U.N.T.S. 175.

all possible steps" to bring the treaty "into force as soon as possible" in view of the recognition that "harvesting of Antarctic marine living resources [wa]s presently taking place" and of "the urgent importance" of achieving the conservation objective of the Convention. *Id*.

The drafters of the Convention prepared its text against the backdrop of significant concerns about overfishing in Antarctic waters. At the time, there was "intense fishing" in the Southern Ocean that had caused species in some areas to be "severely overfished." Commission, *History*, https://tinyurl.com/yv64t48w (last visited Mar. 19, 2026). Heightening the need to protect vulnerable Antarctic fish stocks, the Soviet Union had begun exploiting Antarctic krill. This gave rise to "concerns" regarding the "serious effect" that over-exploitation of the krill fisheries could have on the birds, seals and fish that "mainly depend on krill for food." British Antarctic Survey, *The Convention on the Conservation of Antarctic Marine Living Resources*, https://tinyurl.com/yp7cxhxy/.

The key mandate of Article II(3), which emphasizes the central goal of catch limits, is conserving the Southern Ocean's fish stocks. To accomplish the objective of conserving Antarctica's marine resources, the Convention mandates that all Antarctic fishing must be carried out in accordance with conservation principles and subject to Commission regulations. These include, first and foremost, catch limits. To that end, the Convention provides that insofar as "*[a]ny* harvesting and associated

activities" occur, they "*shall* be conducted in accordance" with three enumerated "principles of conservation." Convention, art. II(3) (emphasis added). Those principles are:

> (a) Prevention of decrease in the size of any harvested population to levels below those which ensure its stable recruitment;
>
> (b) Maintenance of the ecological relationships between harvested, dependent and related populations of Antarctic marine living resources and the restoration of depleted populations; and
>
> (c) Prevention of changes or minimization of the risk of changes in the marine ecosystem which are not potentially reversible over two or three decades.

*Id*.

The word "shall," as used in Article II, is an imperative command. *See*, *e.g.*, *Medellin*, 552 U.S. at 508; *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command. 'Shall' means 'must.'" (citation omitted)); and *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171-172 (2016)); *Application for Review of Judgement No. 158 of the United Nations Administrative Tribunal*, Advisory Opinion, 1973 I.C.J. Rep. 166, ¶ 77 (July 12). As such, it requires that "any," that is, *all*, "harvesting" of fish in the Convention area, *must* be carried out pursuant to those conservation principles.[2]

---

[2] It is immaterial that the Antarctic Treaty "preserves the parties' rights 'under international law with regard to the high seas,' which includes the right to harvest." App. Br. at 6. In concluding the CAMLR Convention, the treaty parties subjected

To fulfill their obligations, the CAMLR Convention assigns to CCAMLR responsibility for exercising regulatory authority in the waters covered by the Convention. Specifically, under Article IX(1), the Commission is empowered to "formulate, adopt and revise conservation measures" that "give effect" to the Convention's conservation principles. CAMLR Convention, art. IX(1).[3] Thus, a CCAMLR-adopted conservation measure cannot be interpreted in a manner that is inconsistent with these principles. As the United States correctly observed in its summary judgment brief below, "the Commission's mandate to regulate harvesting elaborated in the terms of Article IX(2), taken together with the conservation principles in Article II(3), reinforce the conclusion that harvesting is permissible *only* where it does not impede conservation." D.E. 79 at 11 (emphasis added). The District Court agreed, holding that unlimited harvesting "would necessarily contravene the three conservation principles of Article II." *Southern Cross Seafoods*, slip op. at 24.

---

their right to harvest to the operation of the CAMLR Convention and to the binding conservation measures adopted by CCAMLR. Also irrelevant is Appellant's observation that "the Convention's conservation principles . . . include 'rational use.'" App. Br. at 41. Article II(3) of the Convention requires that all "harvesting" of fish in the Convention area must be carried out pursuant to the Convention's conservation principles. Those include combating overfishing in Subarea 48.3.

[3] Commission membership is comprised of the original Contracting Parties to the Convention, as well as States Parties to the Convention that are "engaged in research or harvesting activities" and "regional economic integration organization[s] [that] ha[ve] acceded to th[e] Convention." Convention, art. VII(2).

The Convention underscores the central role contemplated for catch limits in conserving the Southern Ocean's fish stocks. Article IX(2)(a) refers to "[t]he designation of the quantity of any species which may be harvested." Similarly, Article IX(2)(c) concerns "[t]he designation of the quantity which may be harvested from the populations of regions and sub-regions." Such fishing-related conservation measures must be adopted by the Commission through consensus, *id.*, art. XII(1), after "tak[ing] full account of the recommendations and advice of the Scientific Committee," *id.*, art. IX(4).[4]

B. CM 31-01

CM 31-01 requires catch limits or equivalent measures to be in force for fishing to be allowed in Subarea 48.3. It thus promotes the principles that must be given effect through CCAMLR's adoption of conservation measures.

The circumstances of the adoption of CM 31-01 reinforce the conclusion that fishing in the absence of a CCAMLR-adopted catch limit is prohibited. CM 31-01 was motivated by acute concerns about overfishing in Subarea 48.3. In 1984, the Commission's Scientific Committee reported that toothfish in Subarea 48.3 were "being heavily fished and in need of conservation measures." Commission

[4] The Scientific Committee is a "consultative body to the Commission" comprised of appointees of each member of the Commission, who must possess "suitable scientific qualifications [and] who may be accompanied by other experts and advisers." Convention, art. XIV(1)-(2).

Secretariat, *Report of the Third Meeting of the Scientific Committee* (1984), ¶ 7.9, https://tinyurl.com/SC-CAMLR-III. This caused the Commission to recognize "an urgent need for conservation measures for the fish stocks around South Georgia," *i.e.*, Subarea 48.3. Commission Secretariat, *Report of the Third Meeting of the Commission* (1984), ¶ 37, https://tinyurl.com/CCAMLR-III. Indeed, toothfish overfishing was considered to be so serious that, in 1985, many members of the Commission's Scientific Committee supported closing Subarea 48.3 to commercial fishing entirely, so as to allow data to be collected that would permit the Commission to properly manage commercial fishing. *See* Commission Secretariat, *Report of the Fourth Meeting of the Scientific Committee* (1985), ¶¶ 4.37-4.49, https://tinyurl.com/SC-CAMLR-IV.

The following year, the Commission addressed these concerns by adopting CM 31-01. The Commission determined that, beginning with the 1987/88 fishing season, all fisheries in the region would be regulated by catch limits or equivalent measures based on data. *See* CM 31-01. The Commission expected that the data necessary for it to set those limits would be available. *See* Commission Secretariat, *Report of the Fifth Meeting of the Commission* (1986), ¶¶ 52, 69, https://tinyurl.com/CCAMLR-V. Catch limits were adopted the following season for several non-toothfish species (*N. rossii*, *C. gunnari*, *N. gibberifrons*, and *N. guntheri*) for which the Commission had sufficient data. *See id.*, ¶¶ 4.43-4.50; CM

8/VI (1987), https://tinyurl.com/yehtw3dp; CM 10/VI (1987), https://tinyurl.com/2j6u4dpf.

In 1989, data revealed a "rapid rise in catch levels" of toothfish in Subarea 48.3. Commission Secretariat, *Report of the Eighth Meeting of the Commission* (1989), ¶ 104, https://tinyurl.com/4w8bnz57. This caused the Commission and its Scientific Committee to raise the alarm about overfishing. *See id.*; Commission Secretariat, *Report of the Eighth Meeting of the Scientific Committee* (1989), ¶ 3.42, https://tinyurl.com/SC-CAMLR-VIII. At the meeting the following year, the Commission reached consensus on a catch limit for toothfish, based on the advice of its Scientific Committee. Commission Secretariat, *Report of the Ninth Meeting of the Commission* (1990), ¶¶ 13.27, 13.35-13.37, https://tinyurl.com/CCAMLR-IX; *see also* CM 24/IX (1990), https://tinyurl.com/yc8neud6. Consensus on catch limits was likewise reached each year that followed, until 2021, *see* Commission Secretariat, *Fishery Report 2021: Dissostichus eleginoides in Subarea 48.3* (May 27, 2022) at 6, https://tinyurl.com/yk9metvf, when the Russian Federation prevented the Commission from reaching consensus, Commission Secretariat, *Report of the Fortieth Meeting of the Commission* ("CCAMLR-40") (2021), ¶¶ 6.21-6.22, 9.14 (2021), https://tinyurl.com/5n8326th. CM 31-01 thus requires catch limits or equivalent measures to be in force for fishing to be allowed in Subarea 48.3,

promoting the principles that are given effect through the Commission adopting conservation measures.

The catch limits imposed by CCAMLR in Subarea 48.3 have been successful and advanced a crucial conservation function. For example, they have ensured that the toothfish fishery is "fully sustainably fished … without at any time [having] becom[e] overfished or depleted." Commission Secretariat, *Toothfish – precautionary development of a deep-water fishery* (Oct. 21, 2021), https://tinyurl.com/2azjs8uk. Indeed, in 2014, the Subarea 48.3 Patagonian toothfish fishery "earned a 96 out of 100 against the [Marine Stewardship] Council's three principles," "mak[ing] the fishery one of the world's highest scoring" in terms of sustainability. *South Georgia Toothfish Once Again Ranked Among MSC's Top-Rated Fisheries in Third Recertification*, Saving Seafood (September 16, 2014), https://tinyurl.com/mvebmczj/ (last visited Mar. 19, 2026). This success would almost certainly be reversed if Subarea 48.3 were to be thrown open to unlimited fishing, which would be the outcome if Appellant's reading of CM 31-01 were to be adopted. That result is irreconcilable with the objectives of the Convention and the conservation principles to which CM 31-01 must give effect.

It is irrelevant that, in a part of Subarea 48.3, "[t]he UK authorities … imposed a catch limit of 1,670 tons" for the 2021/22 season. App. Br. at 16. To be sure, this catch limit is "more restrictive than the most recent [catch] limit" that CCAMLR had

established. *Id*. But the fact that, in the 2021/22 season, the United Kingdom unilaterally chose to manage a portion (approximately half) of the area covered by CM 31-01 cannot affect how that Commission-issued regulatory instrument is interpreted.[5] Indeed, under Appellant's reading of CM 31-01, the U.K. (and any other Contracting Party) would remain free to adopt a high catch limit that would not give effect to the Convention's conservation objectives. In fact, they would be able to adopt no catch limit whatsoever. Those outcomes would be inconsistent with the Convention's conservation objectives and thus reinforce the propriety of interpreting CM 31-01 as prohibiting fishing when no catch limit is adopted by CCAMLR.

## II. The Express Views and Practice of the Convention Parties Confirm that Fishing is Not Permitted in Subarea 48.3 When CCAMLR Has Not Adopted a Catch Limit.

Consistent with the object and purpose of the Convention and CM 31-01, the United States interprets CM 31-01 to mean that fishing for toothfish was prohibited in Subarea 48.3 because the Commission did not adopt a catch limit or equivalent measure for the 2021/22 fishing season. The United States accordingly—and correctly—denied Appellant's request for a pre-approval certificate. The Supreme

[5] *Compare* Commission, Convention Area, https://tinyurl.com/46fejzwv (last visited Mar. 3, 2026) *with* Government of South Georgia & the South Sandwich Islands, South Georgia & The South Sandwich Island Marine Protected Area Enhancements, https://tinyurl.com/3tpbsywh (last visited Mar. 3, 2026).

Court has made clear that the United States' interpretation, while not conclusive, should be given "great weight." *Medellin*, 552 U.S. at 513; *see also Swarna*, 622 F.3d at 136 (noting the "'well established canon of deference' with regard to Executive Branch interpretation of treaties.").

The interpretation given by the United States accords with that of many Contracting Parties to the CAMLR Convention who likewise understand CM 31-01 to mean that the absence of a CCAMLR-adopted catch limit has the effect of closing Subarea 48.3 to fishing. As parties to the Convention, their views are entitled to "considerable weight." *Water Splash*, 581 U.S. at 282 (citing *Abbott v. Abbott*, 560 U.S. 1, 16 (2010)). Indeed, their views are especially probative because, despite reflecting a diversity of perspectives and interests, they agree that Subarea 48.3 is closed to fishing due to the absence of a catch limit.

For instance, the **European Union** is a member of CCAMLR in its own right and counts among its Member States no fewer than 11 Contracting Parties to the CAMLR Convention. At the 2021 CCAMLR meeting, the European Union explained that the consequence of the Commission's failure "to agree on catch limits for Patagonian toothfish (*D. eleginoides*) in Subarea 48.3 for the 2021/22 season was

to "clos[e] the fishery." CCAMLR Secretariat, *Report of the Fortieth Meeting of the Commission* ("CCAMLR-40") (2021), ¶ 6.28, https://tinyurl.com/38z76fzn.[6]

The **People's Republic of China** expressed the same view when it set out its "understanding of CCAMLR fisheries management" in Subarea 48.3. Specifically, China stated that "no catch limits means no fishing." Commission Secretariat, *Report of the Forty-First Meeting of the Commission* ("CCAMLR-41") (2022), ¶ 139, https://tinyurl.com/msjsbh8u. China thus warned that "vessels participating in a fishery without an agreed catch limit would be conducting IUU [(illegal, unreported, and unregulated)] fishing." CCAMLR-42, ¶ 4.56, https://tinyurl.com/yjnazshd. Most recently, China reiterated that "fishing in Subarea 48.3 without a quota is contrary to the objectives of CCAMLR, expressed deep concern over its repeated occurrence, and stressed that such actions should be classified as serious non-compliance and IUU fishing to safeguard the long-term

[6] Appellant's suggestion that this statement, and a similar one by the U.S. that there is no "scientific basis to close the toothfish fishery in Subarea 48.3" CCAMLR-40, ¶ 6.30, do not reflect the view that the absence of an adopted catch limit under CM 31-01 "require[s] closing the fishery," App. Br. at 36, is incorrect. The E.U.'s unambiguous statement that the fishery would be "close[d]," admits no other meaning. Further, the U.S. has since stated, in clear and categorical terms, that "fishing in Subarea 48.3 should not take place unless an applicable CCAMLR conservation measure is in place to provide the necessary conditions on *catch limits*, by-catch limits, mitigation measures, data collection and reporting, and other requirements." Commission Secretariat, *Report of the Forty-Second Meeting of the Commission* ("CCAMLR-42") (2023), ¶ 96 (emphasis added), https://tinyurl.com/yjnazshd.

health of the Antarctic ecosystem." Commission Secretariat, *Report of the Forty-Fourth Meeting of the Commission* ("CCAMLR-44") (2025), ¶ 7.43, https://tinyurl.com/3kr2mh4h.

The **Argentine Republic** likewise stated that CM 31-01 "was and is intended to prevent fishing in [Subarea] 48.3 without a maximum catch limit determined by the Commission." It expressed "deep[] concern[]" about an interpretation of CM 31-01 that would permit fishing in the absence of a catch limit "because, based on this interpretation, where [the Commission] lack[s] consensus in any area or Subarea, on any species, anyone will interpret it as meaning they can do whatever they want unilaterally, and this would be the beginning of the end of the Convention." CCAMLR-44, ¶ 7.49, https://tinyurl.com/3kr2mh4h; *see also* CCAMLR-40, ¶ 4.53, https://tinyurl.com/38z76fzn (without a catch limit adopted by the Commission there is no "conservation measure" that "would have allowed the operation of the Patagonian toothfish fishery in Subarea 48.3 … as required by CM 31-01."). Argentina further stated:

> What enables fishing under the Convention is not the absence of a ban, but the existence of a CCAMLR conservation measure that allows it. This was the approach adopted by CCAMLR since the adoption of CM 31-01 in 1986. Therefore, *if a conservation measure is not adopted, we cannot infer that fishing is then allowed*, since the Commission has not agreed on a catch limit based on the best available science.

CCAMLR-41, ¶ 125 (emphasis added), https://tinyurl.com/y59bezn2.

The **Russian Federation** agreed. It observed that since "the *D. eleginoides* fisheries in Statistical Subarea 48.3 are regulated by the Commission (CM 31-01)" and there was no "agreement on the catch limit of the *D. eleginoides* fisheries in Subarea 48.3 for the 2021/22 season," the fact that the applicable catch limit in force for the 2020/21 season, CM 41-02, "was not extended for the 2021/22 season" meant that "the [Patagonian] toothfish fishery was closed for 2022." CCAMLR-41, ¶ 124, https://tinyurl.com/y59bezn2. The Russian Federation thus stated that "any toothfish fishery in Subarea 48.3, during the current season … must be identified by CCAMLR as IUU fishing." *Id.*

The same interpretation is shared by **the Oriental Republic of Uruguay**. It expressed the following understanding of CM 31-01:

> [G]iven the absence of the relevant conservation measure, the vessels in question should not fish in that area [*i.e.*, Subarea 48.3]. Otherwise, what is the purpose of adopting conservation measures? We understand that the principle of 'everything which is not forbidden is allowed' does not apply in this case, and we base that position on the very reason for the existence of the conservation measures, namely, conservation—the very objective of the Convention.

CCAMLR-42, ¶ 148, https://tinyurl.com/yjnazshd; *see also* CCAMLR-44, ¶ 97 (noting that Uruguay "supported" the U.S.'s position), https://tinyurl.com/3kr2mh4h.

Additionally, States Parties to the CAMLR Convention have ceased fishing in Subarea 48.3, demonstrating that they also interpret CM 31-01 as prohibiting

fishing in the absence of a catch limit. The **Republic of Chile**, which had previously fished in those waters, now desists from doing so. As Argentina reported, in light of the absence of a catch limit adopted by the Commission, Chile "advised its industry to abstain from fishing in Subarea 48.3 due to concerns about any activities being considered IUU fishing by CCAMLR." CCAMLR-41, ¶ 127, https://tinyurl.com/y59bezn2. Similarly, Uruguay, which had also previously fished in Subarea 48.3, explained that the "landing of Patagonian toothfish from this subarea" in "Uruguayan ports" had been "prohibited" due to the "lack of adoption" of a Commission catch limit. CCAMLR-41, ¶ 128, https://tinyurl.com/y59bezn2.

Appellant is simply wrong in contending that the treaty parties who agree with the United States reflect the views of "*fewer than ten*" of the Commission's members. App. Br. at 36 (emphasis in original). The E.U.'s position alone reflects the interpretation of eight Commission members (Belgium, France, Germany, Italy, the Netherlands, Poland, Spain, and Sweden), plus three additional countries that are parties to the Convention but not members of the Commission (Bulgaria, Finland, and Greece). With those of the United States, the Russian Federation, China, Argentina, Chile, and Uruguay (along with the E.U. itself), no fewer than 15 members of the Commission (and 18 parties to the Convention) have gone on record as endorsing the United States' interpretation.

This considered and publicly articulated interpretation is entitled to "considerable" and "great" weight, *Water Splash*, 581 U.S. at 282; *Medellin*, 552 U.S. at 513. As such, the statements and practice of these treaty parties confirm that the District Court correctly interpreted CM 31-01. *See United States v. Stuart*, 489 U.S. 353, 355 (1989) (observing treaty parties' "conduct generally evinces their understanding of the agreement they signed"); VCLT, art. 31(3)(b) (noting relevance of "[a]ny subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation").

Put simply, the subsequent practice concerning the interpretation of CM 31-01 accords with the text, context, and object and purpose of CM 31-01 and the Convention. Taken together, they confirm that the United States and the court below are correct: CM 31-01 prohibits fishing in Subarea 48.3 in the absence of a CCAMLR-adopted catch limit.

## CONCLUSION

For the foregoing reasons, the Center respectfully submits that the Court affirm the judgment of the District Court.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Nicholas M Renzler*
Nicholas M. Renzler
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: 212-812-0400
Fax: 212-812-0399
nrenzler@foleyhoag.com

Andrew B. Loewenstein
(Application for admission to the Eleventh Circuit bar to be filed)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600
Tel: 617-832-1000
Fax: 617-832-7000
aloewenstein@foleyhoag.com

*Attorneys for* Amicus Curiae
*Center for Biological Diversity*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(5) and 32(a)(7)(B) because this brief contains 4,974 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

March 20, 2026

/s/ *Nicholas M. Renzler*
Nicholas M. Renzler

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will send notice of this filing to all parties through their counsel of record as indicated on the electronic filing receipt.

/s/ *Nicholas M. Renzler*
Nicholas M. Renzler