IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**No. 25-11722**

Southern Cross Seafoods, LLC,

Plaintiff-Appellant,

- versus -

The United States of America and National Marine Fisheries Service,

Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

**APPELLANT SOUTHERN CROSS SEAFOODS, LLC'S REPLY BRIEF**

---

**WHITE & CASE LLP**
Raoul G. Cantero
rcantero@whitecase.com
200 S. Biscayne Blvd. 4900
Miami, FL 33131
Telephone: (305) 371-2700

David E. Bond
dbond@whitecase.com
Earl W. Comstock
earl.comstock@whitecase.com
701 Thirteenth Street NW
Washington, DC 20005
Telephone: (202) 729-2307

*Counsel for Plaintiff-Appellant Southern Cross Seafoods, LLC*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................ iii

REPLY ARGUMENT ON APPEAL ..............................................................1

A. The Denial Letter does not explain how the toothfish Southern Cross sought to import were harvested in contravention of a conservation measure in force........................................................2

B. No source supports an explicit or implied prohibition on catching toothfish in Subarea 48.3...................................................................4

1. CM 31-01's plain text does not support a prohibition on harvesting. ..........................................................................4

2. CM 31-01's drafting history and post-ratification application and understanding do not support an implied prohibition on fishing in Subarea 48.3..................................8

a. CM 31-01's drafting history does not support an implied prohibition on harvesting toothfish unless a catch limit was in place. ............................................8

b. When the Commission did not adopt catch limits in Subarea 48.3, fishing vessels still harvested toothfish there. .....................................................................9

c. The Contracting Parties' post-ratification understanding of CM 31-01 does not support an implied prohibition. ..................................................11

d. Read alongside related conservation measures, CM 31-01 does not condition the right to harvest toothfish on the adoption of a catch limit. ................................13

3. Neither the Convention's text nor its core principles support an implied prohibition on harvesting in Subarea 48.3..........14

a. The Order misinterpreted Article II and the Convention's Preamble.............................................14

b. The Commission's consensus-based process confirms that fishing is the default. ........................................18

c. The historical context for the United States's adoption of the Convention confirms that fishing is the default.20

4. Neither the Act nor its implementing regulations support an implied prohibition on fishing. ..........................................21

C. NMFS's interpretation is entitled to little deference......................22

1. *Loper Bright* requires that courts interpret statutory text without deference to agency interpretation..........................23

2. NMFS's interpretation does not deserve deference under *Skidmore*........................................................................24

3. NMFS's interpretation of the Convention is not conclusive.26

CONCLUSION ..........................................................................................28

CERTIFICATE OF COMPLIANCE ..................................................29

CERTIFICATE OF SERVICE .........................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bruyea v. United States*,
174 Fed. Cl. 238 (Fed. Cl. 2024)....................26

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*,
525 U.S. 155 (1999)....................26

*Fund for Animals v. Kempthorne*,
538 F.3d 124 (2d Cir. 2008)....................6

*Gandara v. Bennett*,
528 F.3d 823 (11th Cir. 2008)....................26

**GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
590 U.S. 432 (2020)....................4

*Hoak v. Ledford*,
153 F.4th 1148 (11th Cir. 2025)....................26

*Legal Environmental Assistance Foundation v. U.S. E.P.A.*,
276 F.3d 1253 (11th Cir. 2001)....................25

**Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).................... 22, 23, 24, 25, 28

*Pielage v. McConnell*,
516 F.3d 1282 (11th Cir. 2008)....................26

*Russello v. United States*,
464 U.S. 16 (1983)....................6

*Se. Fisheries Ass'n, Inc. v. Mosbacher*,
773 F. Supp. 435 (D.D.C. 1991)....................17

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)....................24

*Transmission Access Policy Study Group v. FERC*,
225 F.3d 667 (D.C. Cir. 2000)....................25

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)....................6

*Turner v. U.S. Att'y Gen.*,
130 F.4th 1254 (11th Cir. 2025).................... 24, 25

*Water Splash, Inc. v. Menon*,
581 U.S. 271 (2017)....................26

**STATUTES**

5 U.S.C. § 706(2)(A)....................10

**REGULATIONS**

50 C.F.R. § 300.105....................21

**FEDERAL RULES**

Fed. R. App. P. 32(a)(5)....................29

Fed. R. App. P. 32(a)(6)....................29

Fed. R. App. P. 32(a)(7)(B)....................29

**OTHER AUTHORITIES**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*
170 (2012)....................6

## REPLY ARGUMENT ON APPEAL

The Government's answer brief ignores the criteria for deciding whether to grant an import license. Instead, the Government engages in a lengthy discussion of its own policy preferences and "expertise" in regulating fisheries and interpreting international treaty provisions. It submits that, despite the absence of a conservation measure prohibiting harvesting fish, its interpretations of the statute and the Convention justify denial of a preapproval certificate. The Government then urges the Court to defer to its expertise. The Court should decline to do so.

First, the Antarctic Marine Living Resources Convention Act ("the Act") and its implementing regulations set the parameters for NMFS's consideration of Southern Cross's preapproval certificate (IB 21). These permit denial of an application if the harvest was found to be "in violation of" or "in contravention of" a conservation measure "in force" with respect to the United States (IB 23). The Government insists that CM 31-01 requires the adoption of a catch limit before fishing is "authorized" and that the absence of a catch limit results in the contravention of a conservation measure. But the plain language of CM 31-01 directs Commission actions, not fish harvesting. And that language does not require the Commission to adopt a catch limit to authorize fishing. Treating the Commission's inaction as a conservation measure prohibiting fishing—as the Government proposes—would allow NMFS to deny applications for violations

beyond those of "measures in force." The Court should reverse the judgment on this basis alone. As *Loper Bright* warns, when the statute at issue is unambiguous, courts should apply the language as written—not defer to an agency's policy preferences and expertise.

Second, CM 31-01 is not a self-executing conservation measure. The Convention assigns the determination of "necessary" measures to the Commission. Such measures must be based on scientific evidence and adopted by consensus among the Contracting Parties. Again, the Commission's inaction is not the same as adopting a measure. When the Commission determines that a limit or ban on fishing is necessary, it issues a specific conservation measure. CM 32-02 specifically prohibits harvesting particular species of fish in particular regions of the sea. But it does not prohibit harvesting toothfish in Subarea 48.3. The district court's interpretation allows NMFS to supplant the authority the Convention reserves to the Commission alone.

For these reasons, the Court should reverse the judgment and remand with instructions for entry of judgment in Southern Cross's favor.

### A. The Denial Letter does not explain how the toothfish Southern Cross sought to import were harvested in contravention of a conservation measure in force

For NMFS to have lawfully denied Southern Cross's application, the toothfish had to have been harvested in contravention of "a conservation measure in force with

respect to the United States." NMFS did not show that it lawfully denied the application in the Denial Letter. The Government did not do so in the district court, nor does it do so now.

The Government does not dispute that the Denial Letter relied on CM 31-01. And it agrees that CM 31-01 does not explicitly prohibit fishing (AB 28). It concedes that the Denial Letter does not cite a single conservation measure that prohibits fishing (AB 27–28). Indeed, it concedes that NMFS did not rely on any prohibition at all (*id.*). It admits that NMFS denied Southern Cross's application because no measure *authorized* the harvest—not because any measure prohibited it (AB 12–13, 23). And the Government agrees that the Act requires denying a certificate only when the harvest violates a conservation measure in force (*e.g.*, AB 21).

Instead, the Government contends that the harvest "transgressed" the agency's reading of CM 31-01, which is that the "failure to adopt a *necessary catch limit* contravened CM 31-01 and did not make the harvest *authorized* in accordance with CM 31-01" (AB 23) (emphasis added). But the Government's key phrases—"necessary catch limit" and "authorized"—do not appear in CM 31-01. The Government thus never connects NMFS's denial to a violation of CM 31-01.

The Government's own phrasing confirms Southern Cross's point: "the harvest transgressed . . . CM 31-01's *directive for the Commission* to establish

necessary catch limits . . ." (AB 23) (emphasis added). Both the Denial Letter and the answer brief concede that CM 31-01 directs *Commission* action—not vessel conduct. Neither document explains how either the *Nordic Prince* or its harvest contravened that measure.

### B. No source supports an explicit or implied prohibition on catching toothfish in Subarea 48.3

As the initial brief explained (IB 41–50), neither (1) CM 31-01's plain text; (2) CM 31-01's drafting history and post-ratification understanding; (3) the Convention's text and core principles; nor (4) the Act and its implementing regulations, support an implied prohibition on harvesting in Subarea 48.3. We now address the Government's responses to each point.

#### 1. CM 31-01's plain text does not support a prohibition on harvesting.

The Government does not dispute that CM 31-01 imposes obligations only on the *Commission*—not on fishing vessels or importers (AB 22–23). It does not dispute that the district court should have stopped at the text (IB 24–29). And it ignores the principle that silence is not ambiguity. *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 440 (2020) ("The Convention is simply silent on the issue of nonsignatory enforcement, and in general, 'a matter not covered is to be treated as not covered'") (cleaned up). Instead, the Government argues that, because the *Commission* did not adopt a catch limit under CM 31-01, the *harvest* contravened that measure. But CM

31-01 does not punish harvesters or importers for the Commission's failure to achieve consensus.

In response to the point that CM 31-01 is a procedural rule governing the Commission, the Government states that "NMFS did not say that CM 31-01 itself establishes the catch limit" (AB 28). But that is the only measure the Denial Letter cited and the Government has not cited any other measure the harvest could have violated. Its fallback—that its experience supports its conclusion (AB 28–29)—is not a legal explanation. A conservation measure that defines no operative standard cannot be "contravened." Otherwise, parties would be subject to enforcement based on the Commission's failure to act—not a rule governing their conduct.

The Government argues that the Commission itself contravened CM 31-01 by not establishing a catch limit (AB 22–23). Not so. CM 31-01 provides that the Commission "shall establish such limitation or other measures, as necessary." The Government misreads "as necessary" as "always necessary" (AB 22). The punctuation shows that "as necessary" modifies the Commission's obligation. CM 31-01 directs the Commission to act when necessary; it does not impose a fishing ban, a catch limit, or any other regulation on fishing in Subarea 48.3. Nothing in the text conditions fishing on prior Commission action. Indeed, as discussed in Southern Cross's initial brief, Article IV(1) of the Convention makes clear that, in the absence of Commission action, fishing is permitted (D.E. 73-1 at 23–24, 27).

The Government argues that a catch limit was "necessary" because the Scientific Committee recommended one (AB 34–35). But if a catch limit were required whenever the Scientific Committee recommended one, "as necessary" would add nothing to the sentence. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (noting that courts reject readings that render statutory text surplusage).

The Government also argues that "no basis" exists for concluding that the Commission's failure reflected a decision that a catch limit was unnecessary (AB 22). This turns the issue on its head. Under the Convention, the Commission decides by consensus the measures necessary to regulate fishing. No consensus means that no measure was found necessary—*not* that fishing was prohibited.

Even if CM 31-01 required the Commission to adopt *some* measures every year regulating Subarea 48.3—whether a catch limit or "other measures"—the Commission did so. The Government invokes *Fund for Animals v. Kempthorne*, 538 F.3d 124, 134–35 (2d Cir. 2008), for the unremarkable proposition that one provision can inform another (AB 23). Southern Cross does not dispute that. But the Government misapplies it. CM 31-01's first sentence uses the term "equivalent measures," while the third sentence refers to "other measures." Different language in the same instrument must mean different things. *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("[A] material variation in terms suggests a variation in

meaning"). "Other measures" therefore means something different from "equivalent measures." The Government argues that "equivalent measures" refers to catch limits (AB 22–23). We agree. But then "other measures" must refer to something else.

CM 31-01's opening clause confirms the point. "Without prejudice to other conservation measures adopted by the Commission" aligns with the later reference to "other measures." That structure confirms that CM 31-01 contemplates conservation tools beyond catch limits. It also confirms that CM 31-01 operates alongside other conservation measures the Commission adopts. Yet the Denial Letter deems it "irrelevant" that the harvest complied with the United Kingdom's catch limit and with all conservation measures in force (D.E. 73-1 at 6).

The Government argues that the "other measures" the Commission adopted assume a catch limit on toothfish (AB 31–34). But CM 31-01 is not directed only at toothfish; it applies to all fishing in Subarea 48.3 (IB 29). And the Commission adopted several measures regulating Subarea 48.3 (IB 29). The Government's only answer is that "without a fishery-specific conservation measure containing a necessary catch limit, there is no directed fishery for toothfish in Subarea 48.3" (AB 32). The Government essentially argues that the relevant conservation measures apply only when a fishery exists, and without a catch limit no fishery exists. That reasoning is circular (*see* AB 31–34). Other measures applied to any fishing in Subarea 48.3 with or without a catch limit. CM 23-01, for example, adopted under

CM 31-01, established a five-day catch-and-effort reporting system requiring each Contracting Party to obtain data for each reporting period (D.E. 73-1 at 233). That measure alone complies with the "other measures" directive to the Commission in CM 31-01. But the Commission adopted others as well (*see* IB 29).

**2. CM 31-01's drafting history and post-ratification application and understanding do not support an implied prohibition on fishing in Subarea 48.3.**

The Government does not dispute that the drafting history is silent on what happens in the absence of a catch limit. And it does not dispute that, after the Commission first adopted CM 31-01, vessels fished lawfully in Subarea 48.3 for four years without a catch limit. The Contracting Parties' post-ratification conduct does not reflect a shared understanding that the fishery was closed in the absence of a limit. And CM 32-02—a chart showing which fish species are protected from fishing and in which areas—shows that the Commission knows how to prohibit fishing when it wants to.

**a. CM 31-01's drafting history does not support an implied prohibition on harvesting toothfish unless a catch limit was in place.**

The Government does not respond to Southern Cross's argument that the Order "cherry-picked generalizations from negotiating and drafting history" (IB 31–32). It does not dispute that the report from the Fifth Commission Meeting—which adopted the precursor to CM 31-01—does not mention toothfish, sets no catch limit

for toothfish, does not prohibit fishing in the absence of a catch limit, and does not require the Commission to set a toothfish catch limit every year (*id.*). Instead, the Government argues that the Fifth Commission Meeting report reflects a view that "harvest activities in Subarea 48.3 should be conducted in accordance with catch limits, as necessary," and that CM 31-01 was adopted precisely because unlimited fishing risked overfishing (AB 49). Amicus adds that the Commission adopted CM 31-01 to ensure that fisheries in the region "would be regulated by catch limits or equivalent measures based on data," and that in 1985 many Scientific Committee members supported closing Subarea 48.3 to commercial fishing (Amicus Br. 13). Neither argument supports the conclusion that, without a catch limit, fishing is prohibited.

The Government's view that, from a policy perspective, catch limits support wildlife conservation does not change the legal conclusion that the Commission's failure to reach consensus does not create a ban. Under the Convention, freedom to harvest is the default. Any limitation or ban must be adopted by consensus. If overfishing occurs in any year, CM 31-01 permits the Commission to impose catch limits the following year.

**b. When the Commission did not adopt catch limits in Subarea 48.3, fishing vessels still harvested toothfish there.**

The Government does not dispute that from 1986 to 1990—after CM 31-01 was adopted—vessels fished lawfully in Subarea 48.3 without any catch limit; that

in 1989, the Union of Soviet Socialist Republics ("USSR") blocked what would have been the first catch limit, and fishing continued; or that when the Commission adopted its first limit in 1990, it did not suggest that prior fishing had been illegal (IB 33–34).

Instead, the Government argues that "even if some fish were harvested in that window," it does not show whether *NMFS reasonably found* that Southern Cross's harvest contravened CM 31-01 (AB 52). But the question is not whether NMFS acted reasonably; it is whether NMFS acted in accordance with the law (*see* IB 20). *See* 5 U.S.C. § 706(2)(A) (D.E. 73-1 at 111). And the law permits NMFS to deny applications when they contravene conservation measures in force (IB 23). Nothing suggests that toothfish harvesting between 1986 and 1990 contravened CM 31-01. Whether NMFS had an opportunity to remark on the 1986-1990 harvests (AB 52) does not change their lawful character. The same circumstance occurred in 2021-22—disagreement over the catch-limit level resulted in no catch limit.

The Government argues (AB 52–53) that any harvest between 1986 and 1990 predated a catch limit, whereas the 2021-22 harvest occurred "after the Commission had adopted catch limits for three decades without interruption" (AB 53). But in all those years, CM 31-01's text did not change. The Government's theory requires the conclusion that 30 years of compliance means CM 31-01 retroactively prohibited fishing during that four-year period. No principle of treaty interpretation supports

that reading. And when the Commission adopted a catch limit in 1990—the year after the USSR blocked the first proposed limit and fishing continued—no Commission member suggested that prior harvests were unlawful (*see* IB 33–35).

When CM 31-01 was first applied, the Commission allowed harvesting toothfish in the absence of a catch limit while prohibiting fishing for other species in Subarea 48.3. That contemporaneous practice is the best evidence of how the Commission understood CM 31-01 to work in practice—before the present dispute about its interpretation emerged. The Government cannot change the measure's plain meaning to align with its new position.

The Government also asserts that the Commission's adoption of catch limits for other species in Subarea 48.3 "supports the view that CM 31-01 requires the Commission to adopt necessary catch limits for fisheries in Subarea 48.3, based upon advice from the Scientific Committee" (AB 54). But this simply confirms that the Commission complied with CM 31-01. That measure governs *all* fishing in Subarea 48.3. It does not direct the Commission to adopt catch limits for toothfish in particular. Nor does it support finding that the failure to adopt a catch limit for toothfish resulted in a ban on harvesting such fish.

**c. The Contracting Parties' post-ratification understanding of CM 31-01 does not support an implied prohibition.**

The Government relies on statements from the Fortieth Meeting to argue that member nations understood Russia's veto to have closed the fishery (AB 47–49).

The record does not bear this out (IB 11–12). The Government quotes the European Union's observation that "there is no scientific basis for closing the fishery"—treating it as acknowledging that Russia's veto closed it (AB 47–48). The United States made the same point: it "does not believe there is a scientific basis to close the toothfish fishery in Subarea 48.3." Fortieth Commission Meeting ¶ 6.30. Both statements responded to Russia's own proposal to close the fishery (*see* IB 44). They did not endorse the premise that closure would occur automatically in the absence of consensus for a catch limit (*see* IB 36 (citing Fortieth Meeting ¶ 6.33)).

The Government argues that the silence of most members signals agreement with those who expressed frustration with Russia (AB 50). But under the Convention, consensus is required to *restrict* fishing—not to permit it. The silence of most of the members cannot be converted into affirmative agreement that the fishery was closed. And no member stated that the lack of a catch limit required closing the fishery. The Government cites the UK's statement that Russia's block "results in a failure of CM 31-01" as evidence that the UK understood the fishery to be closed (AB 48). But saying that CM 31-01 "failed"—in the sense that the Commission did not discharge its obligation—is not the same as concluding that the fishery was closed.

The Government ignores the UK's public statement at the following year's meeting. The UK did not agree "that fishing for particular species in Subarea 48.3

is permitted only where there has been agreement to a catch limit for that species;" and it warned that "[s]uch an interpretation would have the effect of reversing the normal position under the Convention" (IB 38).

**d. Read alongside related conservation measures, CM 31-01 does not condition the right to harvest toothfish on the adoption of a catch limit.**

Southern Cross's initial brief cited CM 32-02 (D.E. 73-1 at 140)—a chart listing which fish are protected from fishing and in what areas (IB 13, 39). It prohibits harvesting some species of fish in Subarea 48.3—but not toothfish. And it prohibits harvesting toothfish in several areas—but not in Subarea 48.3.

The Government responds that CM 32-02 "does not bear the weight placed on it" because an explicit prohibition is unnecessary to finding that the harvesting contravened CM 31-01 (AB 34). According to the Government, CM 32-02 does not capture every restriction. It cites zero catch limits for portions of Subarea 48.3 (AB 34; D.E. 24 at 90). But that just proves the point. Those zero catch limits were contained in CM 41-02 (D.E. 73-1 at 141), a conservation measure adopted by consensus—just like every other fishing prohibition the Commission has adopted throughout its 42-year history (IB 33–34). The Government cites no other conservation measure that prohibits fishing by implication. The Court should not find that CM 31-01 is the first.

### 3. Neither the Convention's text nor its core principles support an implied prohibition on harvesting in Subarea 48.3.

Southern Cross's initial brief showed that nothing in the Convention's text, purpose, or overall structure prohibited fishing in the absence of a catch limit (IB 41–49). Among other things, it showed that the international right to fish on the high seas—recognized in the Convention on the High Seas and in the Convention on Fishing and Conservation of the Living Resources of the High Seas—belongs to every state (IB 6–7). If the Convention had intended to abrogate this fundamental right, it would have said so.

The Government's answer brief does not address the international right to fish that the Convention acknowledges. Instead, the Government argues that the Convention's *purpose, structure, and core principles* support a prohibition on fishing absent a catch limit (AB 36–47). NMFS's decision cannot be sustained based on policy concerns or perceived gaps when the Convention itself contains no such prohibition.

#### a. The Order misinterpreted Article II and the Convention's Preamble.

The Government argues (AB 36–39) that Article II establishes the Convention's "overarching objective and principles" and that NMFS's reading applies those principles while Southern Cross's reading "would lead to unlimited fishing, which would be extreme or excessive, and therefore irrational." Amicus

adds (Amicus Br. 9–10) that Article II(3)'s use of "shall" means that "all harvesting" must be carried out under the Convention's conservation principles, and that "unlimited harvesting would necessarily contravene" those principles.

The Government's Article II argument rests on the premise that "unlimited fishing" would be "extreme or excessive" and thus irrational under the Convention's definition of "rational use" (AB 36–37). But if unlimited fishing were "irrational," the Convention would have restricted fishing from the start, while allowing the Commission to permit fishing when appropriate. But the Convention does the opposite: it *permits* fishing as the default, while giving the Commission options to restrict it when consensus is reached. For example, the Commission can impose catch limits for a given species; it can identify protected species; it can designate open and closed seasons for harvesting; it can limit the size of fish that may be harvested; and it can specify harvesting methods such as approved fishing gear (D.E. 73-1 at 26 (Art. IX(2))). But nowhere does the Convention empower the Commission to *permit* fishing. It does not need to do so, because fishing *is* permitted unless and until the Commission adopts—by consensus—a conservation measure restricting it.

The Government's premise that unlimited fishing would occur in Subarea 48.3 absent a catch limit also ignores reality. The Government does not dispute that within the waters in which the toothfish at issue were harvested, the UK had a catch

limit *lower than* the last catch limit the Commission had adopted. It also does not dispute that the *Nordic Prince* was licensed and subject to at least 25 conservation measures in force. The Government only response is that the UK's catch limit is "irrelevant" because NMFS assesses compliance with Commission measures—not the domestic law of the UK (AB 41). But the UK limit is relevant—not to interpret CM 31-01, but to refute the premise that unlimited fishing will occur without a catch limit.

Amicus adds that the UK's catch limit is "irrelevant" because it "cannot affect how that Commission-issued regulatory instrument is interpreted," and warns that under Southern Cross's reading, any party "would remain free to adopt a high catch limit that would not give effect to the Convention's conservation objectives" (Amicus Br. 15–16). But Contracting Parties can adopt lower catch limits by consensus—just as they had done under CM 41-02. In any case, the UK's limit for the 2021/22 season was *lower* than the Commission's prior limit.

The Government next argues that Article II(3)'s use of the word "any" in "[a]ny harvesting and associated activities . . . shall be conducted in accordance with" conservation principles operates as a "threshold determination as to whether and to what extent harvesting will occur" (AB 42). But Article II(3) does not condition the right to harvest (D.E. 73-1 at 23–24). The word "any" describes quantity: the principles apply at all levels of harvesting. NMFS's own Denial Letter

confirms this, defining "rational use" to mean that "harvesting activities that are conducted in a manner consistent with the principles set out in Article II are permissible" (D.E. 73-1 at 5).

The Government also ignores the Convention's long-term outlook. Two of the three conservation principles in Article II(3) focus on "stable recruitment" and prevention of changes "not potentially reversible over *two or three decades*" (D.E. 73-1 at 23–24) (Art. II(3)(a), (c)) (emphasis added). The Government's response—that stocks can suffer short-term recruitment damage—cites a domestic fisheries case, not the Convention (AB 43 (citing *Se. Fisheries Ass'n, Inc. v. Mosbacher*, 773 F. Supp. 435 (D.D.C. 1991))). It does not explain how a single season's harvest below the applicable catch limit would threaten the multi-decade stability the Convention protects. The Commission meets annually. At the Fortieth Meeting, neither the Scientific Committee nor any member expressed concern about unrestricted fishing without a catch limit (Fortieth Meeting ¶¶ 6.22–.38; Fortieth Scientific Committee Meeting ¶¶ 3.45–.66).

The Government also cites the Convention's preamble (AB 40). But the quoted passage simply notes "the concentration of marine living resources found in Antarctic waters and the increased interest in the possibilities offered by the utilization of these resources as a source of protein" (D.E. 73-1 at 22). Nothing in that sentence comes close to authorizing a fishing ban.

**b. The Commission's consensus-based process confirms that fishing is the default.**

Southern Cross's initial brief explained that member states ratified the Convention with the understanding that substantive decisions require unanimity (IB 45–48). But under the Government's reading (AB 49–54), any member can impose a ban by vetoing a catch limit. Not only would that interpretation upend the Commission's consensus-based structure, it would render unnecessary CM 32-02—which lists bans on several species of fish in designated areas. Under the Government's reading, the Commission must first *authorize* fishing—the opposite of what the Convention establishes.

The Government argues that permitting the imports could "damage the consensus-based decision-making of the Commission" because a member wishing to fish without restrictions could block consensus on a catch limit (AB 44). But the Convention itself creates that structure—presumably because member states would not have ratified a structure that would eliminate their citizens' fishing rights without their consent. And the Government's reading creates a greater danger: any member wishing to close a fishery can simply block consensus on a catch limit. That is exactly what Russia did. The Government's position turns a single member's veto into a prohibition.

Southern Cross's reading is faithful to the text. Under the Convention, freedom to fish is the baseline and limitations require unanimous agreement.

Moreover, the Government's feared scenario (AB 44–45) already occurred once—with no destabilizing effect. In 1989, the USSR blocked what would have been the first catch limit for toothfish in Subarea 48.3. Fishing continued. For the next thirty years, the Commission achieved consensus for catch limits. And even now, despite the Commission's recent failures to reach consensus, it retains full authority at its next annual meeting to impose a catch limit or prohibit fishing for the following season.

The initial brief also noted (IB 47) that the Order renders superfluous the Convention's provision allowing member states to exempt themselves from conservation measures (D.E. 73-1 at 26–27) (Art. IX(6)). NMFS responds that Southern Cross "conflates a broad provision in the Convention with a very specific measure" (AB 45). That does not answer the point. Article IX(6) allows members to opt out of *any* conservation measure. But an implied prohibition arising from a lack of consensus is not a conservation measure; it is the absence of one. No member can opt out of it. If a prohibition can arise without a conservation measure, Article IX(6)'s opt-out right vanishes.

The Government also argues that, at the Fortieth Commission Meeting, the members did not disagree about whether a catch limit was necessary but about "the level at which such a necessary catch limit should be set" (AB 45). It lists conservation measures designed to regulate the quantity of fishing—such as catch

limits, closed seasons, and maximum sizes (*id.*). But every measure the Government lists requires Commission consensus. And the record does not support the Government's characterization of the dispute. Russia proposed closing the fishery (Fortieth Meeting ¶ 6.33). And neither the United States nor the European Union saw a scientific basis for closure (Fortieth Meeting ¶¶ 6.28, 6.30).

**c. The historical context for the United States's adoption of the Convention confirms that fishing is the default.**

Southern Cross's initial brief argued that the Senate Report accompanying the Convention's ratification makes clear that, when the Convention was enacted, the concept of conservation included rational use of resources (IB 49). The Government's one-paragraph response (AB 46) does not dispute that the United States ratified the Convention with the understanding that fishing was the default and limitations required agreement. It does not dispute that the Senate Report confirms that conservation includes rational use; that the United States rejected an outright harvesting ban as non-negotiable; or that the Convention was designed to regulate—not to prohibit—harvesting.

The Government's only response to the Senate Report is that its reference to "carefully regulated harvesting" supports its view that harvesting must be regulated to be permissible (AB 46). But "carefully regulated harvesting" describes the *system* the Convention creates—in which the Commission regulates harvesting through consensus-based measures.

The Government later tries to retract its position by arguing that it does not claim that the lack of a catch limit imposes an outright fishing ban, only that it contravenes CM 31-01 (AB 46). But that is not what its Denial Letter said. There, NMFS noted that fishing is not "authorized" without a catch limit (D.E. 73-1 at 7-8). In other words: no catch limit, no fishing. And the mere finding that the harvest contravened CM 31-01 essentially imposes a ban because, under the regulations implementing the Act, NMFS will prohibit importing the toothfish. *See* 50 C.F.R. § 300.105 (authorizing NMFS to issue a preapproval certificate if it finds that the resources were not harvested in violation of any conservation measure).

**4. Neither the Act nor its implementing regulations support an implied prohibition on fishing.**

The initial brief argued that the Act and its implementing regulations do not support an implication that fishing is prohibited in the absence of a conservation measure (IB 50). The Government responds that the Act and regulations required NMFS to deny Southern Cross's application because the harvest was "in contravention of" a conservation measure in force—CM 31-01 (AB 18–26). But that is simply a repeat of its argument about CM 31-01's text. And it fails for the same reason: it does not explain *how* the harvest contravened CM 31-01.

The "in force" requirement is also dispositive. NMFS is permitted to deny a certificate when a harvest is "in violation of" a conservation measure "in force" with respect to the United States (IB 23). As the initial brief explained (IB 21–23), that

language limits enforcement to situations where an adopted Commission conservation measure binds the United States—not where the Commission has failed to act. The Government does not dispute that no conservation measure in force prohibited the harvest. That concession forecloses its position. Treating inaction as a conservation measure disregards the Act's plain language and extends enforcement beyond what Congress authorized.

Undeterred, the Government argues that its "expertise in fisheries conservation and management at the national and international level" supports its interpretation of the Act and the regulations (AB 25); and that courts "may seek aid from the interpretations of those responsible for implementing statutes" (AB 24). But expertise matters only when a statute grants an agency discretion to exercise judgment. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–95 (2024). This statute grants NMFS no discretion to deny an application that satisfies all statutory requirements. The Government cannot convert familiarity with Commission decision-making into authority to read prohibitions into measures that contain none.

### C. <u>**NMFS's interpretation is entitled to little deference**</u>

Southern Cross's final argument was that the district court gave undue weight to the Government's interpretation of CM 31-01 (IB 50). The district court rejected Southern Cross's request for a declaratory judgment because "this Court's analysis may very well change in the future if the views of the United States and other

Contracting Parties change in the future" (D.E. 111 at 13). Under that view, the legality of the same fishing activity, in the same area, under the same law, could change just because the executive reinterprets CM 31-01. That is exactly the sort of shifting, policy-dependent "interpretation" *Loper Bright* forbids. 603 U.S. at 412–413.

**1. *Loper Bright* requires that courts interpret statutory text without deference to agency interpretation.**

The Government does not dispute that *Loper Bright* eliminated *Chevron* deference and that courts must now exercise independent judgment when interpreting statutes. Yet the Government asks the Court to accept its interpretation of CM 31-01 and the Act as controlling based on "NMFS's understanding" (AB 24), "NMFS's expertise" (AB 25), and NMFS's policy concerns about the consequences of failing to adopt a catch limit (AB 44–45). That is precisely the approach *Loper Bright* rejected. Rather than defer to agency interpretations of statutory text, courts must decide "all relevant questions of law" *without* deferring to an agency's preferred interpretation. 603 U.S. at 391–92. The question here is purely legal: when no conservation measure prohibits fishing and all requirements are met, can NMFS deny a preapproval certificate?

The Government reads *Loper Bright* as preserving a form of deference so long as an agency's interpretation is "reasoned" (AB 52). That is not what *Loper Bright* held. To the contrary—the Court rejected any regime under which a reasonable

agency interpretation could displace the court's own best reading of the law. 603 U.S. at 402–403. *Loper Bright* permits courts to consider agency views for whatever persuasive weight they may have, but only as one input into the court's independent judgment. *See id.*

**2. NMFS's interpretation does not deserve deference under *Skidmore*.**

The Government also contends that, despite *Loper Bright*, courts must defer to agencies' "specialized experience" (AB 24–26, 35–36), citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–140 (1944). But *Skidmore* conditions deference on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140. The Denial Letter lacks those factors. It acknowledged that there is "no explicit prohibition on directed fishing for toothfish" in Subarea 48.3 and found that the harvest contravened CM 31-01 without identifying what provision bound the vessel or how the vessel's conduct violated it.

The Government's own cited cases (AB 25, 30) confirm that under *Skidmore* agency interpretations are, at most, persuasive. *Turner v. U.S. Att'y Gen.*, 130 F.4th 1254 (11th Cir. 2025). *Turner* declined to apply deference under *Skidmore* where the interpretive question was "a pure, narrow question of law prime for judicial

resolution using interpretive tools to resolve ambiguity." *Id.* That is precisely the situation here.

The Government also invokes *Legal Environmental Assistance Foundation v. U.S. E.P.A.*, 276 F.3d 1253 (11th Cir. 2001), and *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), as holding that parties challenging agency action as arbitrary and capricious bear a "heavy burden" (AB 30). But as *Loper Bright* explained, the arbitrary-and-capricious standard applies to an agency's policy-making and factfinding decisions—not to its statutory interpretations. 603 U.S. at 391–92. "Section 706 [of the APA] makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference. Under the APA, it thus 'remains the responsibility of the court to decide whether the law means what the agency says.'" *Id.* at 392 (citations omitted).

The Government argues that NMFS's denial required "particularized expertise" because it "rooted its analysis in the specific details of the Commission's decision-making and the factual circumstances at the Fortieth Meeting" (AB 35–36). As discussed above, NMFS's understanding of the Commission's decision-making is flawed and thus its "expertise" suspect. In any case, whether the toothfish was "harvested in violation of a conservation measure in force with respect to the United States" is a legal question. Fishery policy plays no role in resolving it.

### 3. NMFS's interpretation of the Convention is not conclusive.

This Court should decide these issues based on its interpretation of the clear text in the Act, its implementing regulations, and CM 31-01—the only conservation measure NMFS relied on in denying the preapproval certificate. But even if the Court considers the Convention, The Government also does not dispute that the executive branch's treaty interpretations are not conclusive. *Water Splash, Inc. v. Menon*, 581 U.S. 271, 282 (2017). The treaty-interpretation cases the Government cites (AB 36, 42) acknowledge that agency interpretations of treaties are entitled to "great weight," but not that they control the outcome. *See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155 (1999); *Gandara v. Bennett*, 528 F.3d 823 (11th Cir. 2008); *Hoak v. Ledford*, 153 F.4th 1148 (11th Cir. 2025); *Pielage v. McConnell*, 516 F.3d 1282 (11th Cir. 2008). All four cases endorse reading the treaty as a whole. That approach supports Southern Cross: the Convention expressly preserves Contracting Parties' right under the Antarctic Treaty to harvest on the high seas; it does not prohibit fishing in the absence of a catch limit; and CM 32-02 expressly leaves toothfish in Subarea 48.3 unrestricted.

In addition, as the initial brief noted (IB 52–53), agencies' treaty interpretations receive less deference when they differ from the interpretation of other treaty parties. *Bruyea v. United States*, 174 Fed. Cl. 238, 244 (Fed. Cl. 2024) ("[A]n agency's position merits less deference where an agency and another country

disagree on the meaning of a treaty."). Here, the party most directly affected—the UK—has rejected NMFS's interpretation (IB 35–38). Amicus counts other members as endorsing NMFS's view (Amicus Br. 21). But that cannot override the blunt rejection by the sovereign within whose territorial waters the harvesting occurred. The UK's issuance of export certifications establishes that it did not understand the fishery to be closed.

Southern Cross does not ask the Court to set a catch limit, or to second-guess the Commission's scientific judgments, or to override NMFS's expertise. Rather, it asks the Court to answer a legal question: whether the Act and CM 31-01 authorized NMFS to deny an import application when no conservation measure prohibited the underlying harvest. As *Loper Bright* makes clear, interpreting legal text is the judiciary's role, not the executive's. The district court's ruling runs afoul of that principle: by inferring a prohibition not found in any conservation measure, it substituted its own judgment for the Commission's consensus-based process. Although it disclaimed *Chevron*-style deference, it found that the measure's silence on an issue rendered it ambiguous and then afforded "great weight" to the Government's interpretation. That is exactly what *Loper Bright* forbids.

For all these reasons, the district court erred in treating NMFS's interpretation as dispositive. The Court must exercise its own independent judgment about

whether CM 31-01 prohibited Southern Cross's harvest. *Loper Bright*, 603 U.S. at 391.

## CONCLUSION

For the reasons stated above and in the initial brief, the Court should reverse the Order, hold that the Service did not act in accordance with the law when it denied Southern Cross's application, and set aside the Service's denial of Southern Cross's preapproval application.

Dated: May 4, 2026

Respectfully submitted,

*/s/ Raoul G. Cantero*

WHITE & CASE LLP
Raoul G. Cantero
Florida Bar No. 552356
Southeast Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Telephone: (305) 995-5290
Facsimile: (305) 358-5744
E-mail: rcantero@whitecase.com

David E. Bond
Earl W. Comstock
701 Thirteenth Street NW
Washington, DC 20005
Telephone: (202) 729-2307
E-mail: dbond@whitecase.com
E-mail: earl.comstock@whitecase.com

*Counsel for Plaintiff-Appellant,*
*Southern Cross Seafoods, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,437 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and the Local Rules of the Court.

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally based typeface using Word for Microsoft 365 in 14-point Times New Roman Font.

*/s/ Raoul G. Cantero*
Raoul G. Cantero

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. All participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Raoul G. Cantero*
Raoul G. Cantero